**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

**(1) LACI ORTIZ,**

**Plaintiff,**

**v.**

**(1) RELIANCE STANDARD LIFE INSURANCE COMPANY,**

**Defendant.**

**Case No.** CIV-22-686-HE

**ATTORNEY LIEN CLAIMED**

**COMPLAINT**

Plaintiff Laci Ortiz, for her cause of action against Defendant Reliance Standard Life Insurance Company ("Reliance Standard"), alleges and states as follows:

**I. Jurisdiction and Venue**

1. Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq*., to recover benefits due under an employee benefit plan, and to recover costs and attorney's fees as provided by ERISA.

2. This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. Under 29 U.S.C. § 1132(f), this Court has jurisdiction without regard to the amount in controversy or the citizenship of the parties.

3. Venue is properly in this district pursuant to 29 U.S.C. § 1132(e)(2) and pursuant to 28 U.S.C. § 11391(b), in that a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

**II. Parties and Plan**

4. Plaintiff is a thirty-seven (37) year-old woman. She resides in Edmond, Oklahoma and within this judicial district.

5. Reliance Standard is a foreign insurance company having its principal place of

business in Philadelphia, Pennsylvania. At all relevant times, Reliance Standard is licensed and authorized to sell insurance within the State of Oklahoma and it transacts business within the State of Oklahoma and within this judicial district.

6. Plaintiff was hired by Yardi Systems, Inc. ("Yardi") in June 2009 and was continuously employed thereafter until being terminated, following the onset of her disability, in November 2020.

7. At all relevant times, Yardi provided long term disability ("LTD") insurance coverage to its eligible employees through a welfare benefit plan – the Yardi Systems Health and Welfare Benefit Plan (the "Plan").

8. At all relevant times, Plaintiff was eligible to participate in the Plan, did participate in the Plan, and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7).

9. The LTD insurance coverage and benefits applicable to Plaintiff by virtue of her participation in the Plan was pursuant to a group LTD insurance policy underwritten and issued by Reliance Standard, Master Policy LSC 97,200 (the "LTD Policy") to the Policyholder.

10. The Policyholder is the RSL Group and Blanket Insurance Trust ("Insurance Trust"). At all relevant times, Yardi was a participant in the Insurance Trust.

11. Claims for disability benefits under the Plan are administered by Reliance Standard pursuant to the terms of the LTD Policy. And benefits under the Plan are paid by Reliance Standard.

12. Reliance Standard is and was a Plan fiduciary within the meaning of 29 U.S.C. § 1002(21)(A).

13. According to the terms of the LTD Policy, "Total Disability" means "that as a result of an Injury or Sickness, during the Elimination Period and for the first 24 months for which a

Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation; and . . . after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of Any Occupation."

14. The LTD Policy does not define the term "material duties."

15. The LTD Policy defines "Regular Occupation" as "the occupation the Insured is routinely performing when Total Disability begins." The LTD Policy further states "[w]e will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale."

16. The LTD Policy defines "Any Occupation" as "an occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training or experience."

17. According to the "insuring clause" of the LTD Policy, Reliance Standard will pay a monthly benefit to an insured who is (1) totally disabled as a result of a sickness or injury covered by the LTD Policy; (2) is under the regular care of a physician; (3) has completed the elimination period; and (4) submits satisfactory proof of total disability to Reliance Standard.

18. According to the LTD Policy, "Sickness" is defined as an "illness or disease causing Total Disability which begins while insurance coverage is in effect for the Insured."

19. The elimination period is 90 consecutive days of total disability.

20. The LTD Policy does not define the term "satisfactory proof."

21. The LTD Policy contains a "Written Proof of Total Disability" provision. The provision does not state or define the quantum of evidence needed to establish total disability.

22. The LTD Policy does not require objective medical evidence to establish total disability.

23. Under the LTD Policy, the monthly benefit is an amount equal to 60% of Covered Monthly Earnings.

24. Pursuant to the terms of the LTD Policy, the gross monthly disability benefit payable to a disabled Yardi employee is the lesser of 60% of the employee's Covered Monthly Earnings or the Maximum Monthly Benefit.

25. The Maximum Monthly Benefit under the LTD Policy is $10,000 per month.

26. For a LTD claimant whose disability begins before age 62, the Maximum Duration of Benefits is the claimant's 67th birthday.

27. The Plan and related LTD Policy do not contain any provision wherein discretion is expressly reserved to Reliance Standard to determine benefit eligibility or entitlement.

28. The LTD Policy states "This policy is delivered in Rhode Island and is governed by its laws and/or [ERISA] as amended, where applicable."

29. Rhode Island prohibits the inclusion of discretionary clauses in insurance policies *See* R.I.G.L. 1956 § 27-18-79.

**III. Allegations Applicable to All Claims**

30. As a consequence of a pregnancy, facial neuropathy, left arm neuropathy, and weakness, Plaintiff ceased working on and after June 15, 2020.

31. She made a claim for short term disability ("STD") benefits, which Reliance Standard administered on behalf of Yardi.

32. Reliance Standard approved Plaintiff's STD claim for payment for the duration of the STD benefit period – June 22, 2020 through September 14, 2020.

33. The STD claim approval was explained by Reliance Standard as follows:

> Based on a review of all available medical records the claimant is precluded from full time consistent work function ongoing due to a movement disorder with

> episodes of rigidity of extremities and face occurring up to 6 times per day, using a walker for stability.

34. Plaintiff was transitioned into a LTD claim with Reliance Standard on or about September 9, 2020. Plaintiff's STD claim file records were transferred into the newly-opened LTD claim.

35. Those medical records evidenced and confirmed Plaintiff's reporting of intermittent facial weakness, upper left extremity tingling and weakness, whole body stiffening, and episodic inability to move her extremities lasting two to three minutes.

36. The initial LTD claim records included a progress note from Dr. Julie Hansen dated July 24, 2020, wherein Dr. Hansen noted her direct observation of Plaintiff:

> I witnessed an "episode" today where [patient] was noted to be rigid with eye "fasciculations" and rigidity of extremities. [Patient] seemed aware but was unable to speak or respond directly; lasted abou[t] 2-3 minutes.

37. Dr. Hansen's noted impression in the progress note dated July 24, 2020 was "acquired facial neuropathy and movement disorder . . . having dystonic episode movement in lower extremities."

38. The initial LTD documents also included a copy of the Yardi job description applicable to Plaintiff's employment as a Senior Marketing Specialist.

39. The content of the Yardi job description evidences and establishes that Plaintiff's regular occupation was cognitively demanding, and interposed material duties such as: (1) critical thinking about applicable principles, tactics, analysis, decision-making, and problem solving; (2) ability to lead; (3) ability to work in a collaborative team environment; (4) attention to detail and time management; and (5) excellent verbal and written communication skills.

40. The Yardi job description also exemplified the "working conditions/physical demands" of Plaintiff's regular occupation, which included "ability to work at assigned office

location," "regular attendance and a regular work schedule," and "ability to lift 10 lbs."

41. By letter dated September 27, 2020, Reliance Standard confirmed that Plaintiff's LTD claim had been received and initial processing was under way.

42. The initial processing included an "initial interview" with Plaintiff, which was done on October 19, 2020. Therein, Plaintiff explained she was having difficulty standing without help and, during seizure episodes, her limbs stiffened and she had stiffness in her hands – all of which made standing, walking, typing, and holding things very difficult for her.

43. By letter dated October 22, 2020, Reliance Standard advised Plaintiff that her LTD claim was undergoing a medical review.

44. The medical review was done by a Reliance Standard nurse on October 30, 2020.

45. The nurse opined that "based on medical records, lack of work function is supported from [date of loss] through 11/11/2020."

46. On December 8, 2020, the assigned Reliance Standard claim examiner recommended approval of Plaintiff's claim because of her movement disorder and related seizure episodes and symptoms.

47. By letter dated December 10, 2020, Reliance Standard notified Plaintiff it had approved her LTD claim for payment.

48. In view of the LTD benefit rate and Plaintiff's covered monthly earnings, Reliance Standard began paying $3,505.46 per month to Plaintiff following the approval of her LTD claim.

49. In January and February 2021, Plaintiff provided updated information to Reliance Standard about an EMG test, a MRI, future appointments with her treating doctors, and impending physical and occupational therapy.

50. On February 2, 2021, based on the medical records and information received from

Plaintiff about her ongoing and impending treatment, Reliance Standard noted the following action plan:

> Reasonable to support disability to 6/05/21 to allow further workup of symptoms and for [Plaintiff] to [begin] both physical and occupational therapies. [Plaintiff] will be undergoing MRI's as well so [additional treatment] may be necessary.

51. On March 22, 2021, Plaintiff sent information about her MRI thoracic spine testing and her next scheduled neurology-related appointment to Reliance Standard.

52. The MRI findings included "multilevel vertebral hemangiomas."

53. And Plaintiff advised Reliance Standard she was going to discuss the MRI findings with Dr. Ashish Masih because the symptoms of such tumors can cause the type of issues she was experiencing.

54. On May 7, 2021, Reliance Standard updated Plaintiff's disability claim status to presume she would remain disabled to the "any occupation" change date of September 5, 2022.

55. With respect to Plaintiff's presumed disability to September 2022, the Reliance Standard claim examiner stated:

> [Plaintiff's] position is mostly sedentary, must lift up to 10 lbs. Due to spine and hand issues [it] may be reasonable to assume [Plaintiff] will be unable to perform material duties of own [occupation]. Pending updated records for confirmation and full etiology.

56. On May 19, 2021, after receiving additional medical records and treatment information, the assigned Reliance Standard examiner stated that it was "reasonable to support disability to 9/05/21 to allow further workup of symptoms and for [Plaintiff] to complete both physical and occupational therapies."

57. In September 2021, Plaintiff provided detailed information about her ongoing symptoms to Reliance Standard, which included pain, weakness in limbs, hands and fingers, leg numbness, and severe whole body hypertonia.

58. Plaintiff also provided updated information about her treating healthcare providers, including the neuromuscular and nerve disorder specialist to whom she had been referred and about her ongoing physical and occupational therapy.

59. In October 2021, Reliance Standard requested medical records from the healthcare providers Plaintiff had identified.

60. Reliance Standard received Dr. Aaron Farrow's encounter note dated September 17, 2021 and related laboratory testing. The note evidenced and confirmed Plaintiff's continuing reports of right-side symptoms. The note also reflected Plaintiff's additional reports of paresthesias in her arms, burning and tingling in the cervical spine area, and three to five headaches a week.

61. Dr. Farrow's note included his assessments, which were (1) spell of generalized weakness; (2) convulsions, unspecified convulsion type; (3) functional weakness; (4) functional neurologic complaint; (5) migraine without aura; (6) tachycardia; and (7) positive Lhermitte's sign.

62. Dr. Farrow's noted plan was to continue with all appropriate treatment and diagnostic efforts, including a C-spine MRI, continued physical therapy, and a consultation with Dr. Anai Hamasaki.

63. On December 14, 2021, the assigned Relance Standard claim examiner sent Plaintiff's file for another "medical review" by a Reliance Standard nurse.

64. As of December 14, 2021, Reliance Standard had not received Dr. Hamasaki's records.

65. As of December 14, 2021, Reliance Standard had not requested, pursued, or received Plaintiff's physical and occupational therapy records.

66. Nevertheless, a Reliance Standard nurse did the requested medical review on December 22, 2021.

67. The nurse's review was done without consideration of Dr. Hamasaki's records or Plaintiff's physical and occupational therapy records because such were not in the claim file.

68. The Reliance Standard nurse opined that the records and information in the file failed to "demonstrate a severity" of conditions or symptoms such that an inability to work was established.

69. The nurse characterized Plaintiff's information as "self-reported symptoms" and described the medical records as lacking in "documented physical findings."

70. The next day, on December 23, 2021, Reliance Standard decided to deny Plaintiff's LTD claim.

71. On December 29, 2021, a Reliance Standard supervisor "okayed" the sending of a claim denial letter to Plaintiff. As reflected in the claim file notes, the supervisor praised the claim examiner as having done a "Good job!" in denying the claim.

72. A denial letter dated December 28, 2021 was sent to Plaintiff.

73. On December 30, 2021, while unaware of the LTD claim denial, Plaintiff sent additional information and records to Reliance Standard.

74. By her submission on December 30, 2021, Plaintiff advised Reliance Standard she had been hospitalized for a severe muscle rigidity and tremor issue on November 16, 2021. She also advised about her recent treatment with Dr. Hamasaki and a referral to a neuroimmunologist, Dr. Nibhiben Anadani. And she advised about having had over 40 appointments for neuro treatment and hand therapy.

75. By her submission on December 30, 2021, Plaintiff provided documentation about her November and December 2021 medical care, including the hospitalization on November 16, 2021. As reflected in the hospitalization-related records from the OU Medical Center emergency

department, Plaintiff presented with complaints about symptoms earlier in the day, which included stiffened limbs, an inability to move from the mouth down, neck pain, and headache.

76. The OU Medical Center emergency department record evidenced abnormalities upon physical examination of Plaintiff, including constricted and stiff bilateral hands, plantar flexed and stiff feet bilaterally, and decreased right-side lower extremity sensation.

77. By her submission on December 30, 2021, Plaintiff also provided documentation about her post-hospitalization follow-up with her primary care doctor, Dr. Roopali Gupta, on December 3, 2021. Dr. Gupta's note evidenced and confirmed Plaintiff's report of ongoing right arm pain and tenderness.

78. And Dr. Gupta's note dated December 3, 2021, evidenced and confirmed Dr. Gupta's noted observation of "mild redness and pain in the arms."

79. By email dated January 3, 2022, Reliance Standard acknowledged receipt of Plaintiff's information and records. Reliance Standard advised Plaintiff that her claim had recently been denied, but that the information she provided would be sent to the "medical team" to see if it changed the denial decision.

80. The "medical team" referred to was a single Reliance Standard nurse.

81. On January 4, 2022, the Reliance Standard nurse reviewed the additional records and information provided by Plaintiff but the nurse did not change her medical opinion.

82. The Reliance Standard claim examiner and nurse didn't acknowledge or comment on Plaintiff's advisement about having had over 40 appointments for neuro treatment and hand therapy.

83. The Reliance Standard claim examiner and nurse didn't pursue the records from Plaintiff's appointments for neuro treatment and hand therapy.

84. Instead, Reliance Standard sent Plaintiff a letter dated January 11, 2022 and advised that it was persisting in denying her LTD claim. Reliance Standard also advised Plaintiff that, if she disagreed with the LTD claim decision, she could follow the appeal process steps in the denial letter dated December 28, 2021.

85. Plaintiff appealed in accordance with the appeal process steps set out Reliance Standard's claim denial letter.

86. By letter dated April 13, 2022, Plaintiff commenced an appeal and submitted additional information and medical records in support of her claim.

87. As stated in her appeal, Plaintiff asserted that Reliance Standard's claim denial decision was unprincipled and wrong because (1) the adverse claim decision was not based on the application of the LTD Policy terms to the claim facts; (2) Reliance Standard failed to gather and consider Plaintiff's pertinent physical and occupational therapy records; (3) the adverse claim decision was based on a medical review done by a nurse, who was unqualified in the medical fields of neurology and neuromuscular/movement disorder; and (4) Reliance Standard interposed a "proof of loss" requirement not in the LTD Policy.

88. Plaintiff's appeal submission included the records Reliance Standard didn't bother to obtain or consider, i.e., Plaintiff's physical and occupational therapy records in 2021 and Plaintiff's evaluation encounter with Dr. Hamasaki in 2021.

89. The physical and occupational therapy records submitted by Plaintiff to Reliance Standard in support of her appeal evidenced and confirmed Plaintiff's therapy sessions undertaken because of her systemic pain and neuromuscular stiffness/weakness. The therapy records documented abnormal findings and confirmed that, despite the extensive therapy, Plaintiff continued to have functional deficits related to strength, balance, range of motion, and gait.

90. The records reflecting Plaintiff's evaluation by Dr. Hamasaki on October 15, 2021 evidenced and confirmed Plaintiff's reporting of numbness and tingling in her toes, feet and fingers, tingling in her neck, extremities pain, muscle weakness, and impaired balance. Dr. Hamasaki's note documented her abnormal findings upon examining Plaintiff, i.e., "right upper and lower extremity spasticity with limited range of motion and hyperreflexia."

91. Plaintiff's appeal submission included a Letter Report from Dr. Gupta dated January 18, 2022, wherein Dr. Gupta, after explaining Plaintiff's medical course to date, endorsed that Plaintiff "is impaired in activities of daily living because of her significant health conditions and needs mobility aides and assistance with childcare and driving."

92. Plaintiff's appeal submission included a visit note from Dr. Anadani concerning Plaintiff's treatment on January 24, 2022. The "history of present illness" section of Dr. Anadani's note detailed the course of Plaintiff's neurologic issues and more recent status, including fine motor issues and difficulty writing.

93. Dr. Anadani's visit note also reflected her abnormal findings upon physical examination of Plaintiff, which were described as "diffuse spasticity, weakness, and remarkable hyperreflexia with [bilateral] knee and ankle clonus and spastic gait."

94. Dr. Anadani's visit note included her impression, which was Plaintiff's "symptoms and examination findings are typical of stiff person syndrome typically associated with [glutamic acid decarboxylase antibodies] though GAD AB was negative in 09/2020."

95. Plaintiff's appeal submission included a Letter Report from Physical Therapist, Rebecca Jones, dated February 3, 2022. After detailing the course of Plaintiff's treatment in 2021, Dr. Jones extensively detailed measurements pertinent to Plaintiff's functionality and stated: "Currently, Laci still has difficulty with stiffness, strength, gait, fatigue, balance, and pain."

96. In her Letter Report dated February 3, 2022, Dr. Jones continued by stating:

> I recommend that Laci continues physical therapy as she continues to require skilled intervention to progress with improving stiffness, strength, gait, fatigue, and pain. Laci continues to demonstrate overall improvement in physical therapy with these skills. She does still demonstrate weakness of her right lower extremity, difficulty with her gait pattern, fall risk, decreased balance due to difficulty with movement, fatigue due to difficulty with movement, and pain.

97. Plaintiff's appeal submission included a Letter Report from Occupational Therapist, Alaine Thigpen, dated February 22, 2022. Dr. Thigpen detailed Plaintiff's course of therapy since April 2021, and confirmed that Plaintiff continued to struggle with writing and performing right-handed tasks because of weakness. Dr. Thigpen also confirmed that Plaintiff had postural issues related to tonal changes and limited arm use.

98. Although Dr. Thigpen did not address Plaintiff's work-related functionality or limitations in her Letter Report, she did endorse that Plaintiff's arm and hand limitations "have significantly limited her ability to care for her small children as well as herself."

99. Reliance Standard received Plaintiff's appeal on April 16, 2022.

100. After receiving no response or acknowledgement from Reliance Standard in relation to the appeal, Plaintiff followed up by letter dated May 10, 2022. Plaintiff requested confirmation as to Reliance Standard's receipt of her appeal and the status of the same.

101. On May 19, 2022, a Reliance Standard LTD Supervisor, Latonya Puckett, contacted Plaintiff's counsel in response to Plaintiff's letter dated May 10, 2022. Ms. Puckett advised that Reliance Standard couldn't find Plaintiff's LTD claim appeal letter and submissions dated April 13, 2022.

102. On May 19, 2022, Plaintiff's counsel sent Plaintiff's LTD appeal and submissions to Ms. Puckett by email. Plaintiff's counsel also sent Ms. Puckett the mail records and receipt as proof of the date Plaintiff's appeal was received by Reliance Standard.

103. Ms. Puckett responded in a follow-up email on May 19, 2022 and advised "I am in receipt of [y]our email and the attachments. I am forwarding this information so that it can be scanned to the claim file and available for the Appeal Team's review."

104. Inexplicably, several days later a Reliance Standard letter dated May 19, 2022 was received by Plaintiff's counsel which advised "it appears we did not receive" Plaintiff's appeal or any of her accompanying information.

105. In the letter dated May 19, 2022, Reliance Standard requested postal records indicating delivery of Plaintiff's appeal.

106. Reliance Standard also advised Plaintiff about several appeal-related issues, including that: (1) it would require Plaintiff to undergo an independent medical examination ("IME"); (2) an independent external vendor would arrange for the IME; (3) the vendor would notify Plaintiff of the IME scheduling arrangements: and (4) it was invoking its right to take an additional 45 days to decide Plaintiff's appeal.

107. Following its letter dated May 19, 2022, Reliance Standard did not contact or communicate with Plaintiff about her appeal until July 25, 2022, which was 100 days after it received her appeal.

108. By email on May 23, 2022, Plaintiff's counsel responded to Reliance Standard and advised about (and forwarded) his email of May 19, 2022 to Ms. Puckett. By the email on May 23, 2022, Plaintiff's counsel again provided Plaintiff's LTD appeal, appeal submissions, and the mail records to Reliance Standard – all of which confirmed the onset of Plaintiff's appeal effective April 16, 2022.

109. By letter dated May 24, 2022, Plaintiff's counsel reaffirmed the course of events on Plaintiff's appeal and also provided an additional medical record in support of Plaintiff's appeal.

110. The additional medical information submitted was an office visit note from Dr. Anadani concerning Plaintiff's treatment on April 15, 2022. The note confirmed Dr. Anadani's abnormal findings upon physical examination, which were described as "motor: tone: spasticity on right side" and "spastic ataxic gait with scuffing of right foot."

111. Reliance Standard did not respond to the May 24, 2022 letter from Plaintiff's counsel.

112. On July 20, 2022 – 95 days after Plaintiff commenced her appeal – an independent external vendor contacted Plaintiff's counsel about possibly scheduling an IME in Tulsa, Oklahoma (108 miles from Plaintiff's home in Edmond) on August 1, 2022.

113. The vendor contact on July 20, 2002, was the first and only such contact after Reliance Standard's IME-related letter dated May 19, 2022.

114. By letter dated July 25, 2022, Plaintiff's counsel advised Reliance Standard of the untimely vendor contact about scheduling an IME.

115. By the letter dated July 25, 2022, Plaintiff's counsel also advised Reliance Standard that its time to decide Plaintiff's appeal had come and gone pursuant to the applicable ERISA regulations.

116. In an email exchange between Reliance Standard and Plaintiff's counsel on July 25, 2022, Plaintiff's counsel reiterated to Reliance Standard that it had failed to render a final decision within the applicable ERISA timelines. Plaintiff's counsel further advised that because Reliance Standard had failed to render a timely decision, Plaintiff's appeal was deemed denied by operation of law.

117. Reliance Standard did not and has not communicated further about this matter at any time after July 25, 2022.

118. Reliance Standard failed to reach a decision on Plaintiff's appeal within the time period mandated by the applicable ERISA regulations.

119. Reliance Standard's failure to timely decide Plaintiff's appeal was not caused by any failure or delay on the part of Plaintiff.

120. Because Reliance Standard failed to render a final decision within the temporal limits prescribed by ERISA, a *de novo* standard of review applies to Plaintiff's claim. *See Coates v. Reliance Standard Life Ins. Co.*, 2017 WL 1536229, *2 ("Under clear and settled Tenth Circuit law, failure to comply with ERISA's regulatory time limits for deciding claims or appeals—as set forth in 29 C.F.R. § 2560-503.1—constitutes a "procedural irregularity" resulting in de novo review.")

121. Plaintiff has exhausted her administrative remedies.

## IV. Statement of Claims

### First Claim

### ERISA – Improper Denial of Benefits

122. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 121 of this Complaint as though set forth at length herein and further alleges:

123. At all relevant times, the terms of the Plan and LTD Policy required payment of LTD benefits to Plaintiff due to her debilitating impairments.

124. Reliance Standard's failure to pay LTD benefits to Plaintiff beyond December 2021 is contrary to the terms of the Plan and LTD Policy, and is wrong, incorrect, and/or unreasonable.

125. Plaintiff seeks a declaration from this Court that she is entitled to the LTD benefits due her under the terms of the Plan and LTD Policy, in the amounts and for the duration consistent with the terms of the Plan and LTD Policy, and an Order that all future disability benefits should

be paid and/or maintained pursuant to the terms of the Plan.

126. Because Reliance Standard has failed to pay Plaintiff the LTD benefits due pursuant to the terms of the Plan and LTD Policy, Plaintiff has been forced to retain an attorney to secure the benefits. Plaintiff has and will incur attorney fees and costs. Plaintiff is entitled to recover her reasonable attorney fees and costs of this action pursuant to 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Plaintiff Laci Ortiz demands judgment against Defendant Reliance Standard Life Insurance Company, as follows:

(1) for a declaration that Defendant's failure to pay LTD benefits to Plaintiff beyond December 2021 is contrary to the terms of the Plan and LTD Policy, and that Plaintiff is entitled to receive the amount of benefits due under the terms of the Plan that have not been paid, together with prejudgment and post-judgment interest thereon;

(2) for a declaration that all future LTD benefits be paid pursuant to the terms of the Plan;

(3) for the costs of this action and Plaintiff's attorney fees pursuant to 29 U.S.C. § 1132(g); and

(4) for such other and further relief as may be deemed just and proper by the Court.

**Respectfully submitted,**

**SHOOK & JOHNSON, PLLC**

**By: s/ Jonathan E. Shook**
**Jonathan E. Shook, OBA #17343**
**7420 S. Yale Avenue**
**Tulsa, OK 74136**
**Telephone: (918) 293-1122**
**Facsimile: (918) 293-1133**
**jshook@shookjohnson.com**

**ATTORNEY FOR PLAINTIFF**